Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence, or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS in part and MODIFIES in part the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as facts and concludes as matters of law the following which were agreed upon by the parties as
STIPULATIONS
1. The parties stipulated into evidence the Industrial Commission Form 21 received by the Commission on October 19, 1989, which included jurisdictional stipulations as well as the average weekly wage.
2. The parties further stipulated that the plaintiff was paid temporary total disability benefits at the rate of $200.01 for the period of August 4, 1989 through August 3, 1990 and from December 10, 1990 through August 30, 1992.
*****************
The Full Commission adopts in part and modifies in part the findings of fact of the deputy commissioner and finds as follows:
FINDINGS OF FACT
1. Plaintiff was forty (40) years old at the time of the hearing and is a high school graduate. She began working at Ingles Markets on June 22, 1989 and was employed as a bakery manager in August 1989. On August 2, 1989, plaintiff dropped a four (4) pound weight on her left large toe.
2. Plaintiff's workers' compensation claim was accepted as compensable, with a Form 21 being approved at the Industrial commission on November 8, 1989 and a Form 26 being executed by the parties on March 11, 1991.
3. Initially, plaintiff was treated by her family physician for several weeks until being referred to David L. Soulsby on October 6, 1989. Dr. Soulsby found that, while the plaintiff had apparently sustained a fracture of some type to her left large toe, she was progressing satisfactorily and had a good bit of improvement. As of October 20, 1989, Dr. Soulsby noted that she could continue to work with limited standing and walking. This work release remained in effect until January 22, 1990, when based upon plaintiff's complaints as well as x-rays, Dr. Soulsby proceeded with surgery to remove a loose body in the joint. Dr. Soulsby recommended that as of February 15, 1990, the plaintiff could gradually increase activity and wear normal shoes. On April 3, 1990, although the plaintiff continued to complain of some pain, the doctor noted that she was able to wear regular shoes and, furthermore, did not exhibit any facial or other expression normally associated with pain. As the plaintiff was able to walk without apparent difficulty and with no limp, the doctor noted that while she stated she was not working, it was his recommendation that she could return to employment without any restrictions.
4. After her release to return to work by Dr. Soulsby, plaintiff applied for and collected unemployment compensation until obtaining a job at Kroger Grocery Store in May 1990 as a deli clerk. Plaintiff began seeing doctors at Roanoke Orthopaedic Center in Virginia. Dr. Henning completed a physical examination and reviewed x-rays on May 7, 1990, finding no significant problems with the plaintiff. Notably, while the plaintiff had no active motion in her joint on her own, passively with the doctor's assistance, she was able to move her joint. Dr. Henning simply told plaintiff to return in two (2) months and in the meantime recommended she look for work, including work in which she had to be "on her feet".
5. Plaintiff obtained no medical treatment from May 7, 1990 through August 22, 1990. Despite the recommendations of Dr. Soulsby and Dr. Henning that plaintiff could work in any capacity, she left her job at Kroger in late July or early August 1990. Thereafter, plaintiff was seen by Dr. Robert S. Widmeyer, who examined the plaintiff and ordered an x-ray on November 15, 1990. The x-ray showed considerable joint space to be maintained in the joint. Given the degree of complaints of the plaintiff, the doctor expected a complete destruction of the joint, but this was not what the x-ray revealed.
6. Thereafter, the doctor simply had plaintiff fitted with a supported splint and recommended that she see Dr. Shaffer for an evaluation. As to further treatment, in particular fusion of the toe joint, the physician stated, "I really can't say that a fusion now would do anything; I really don't know." During treatment, Dr. Widmeyer never restricted plaintiff from working.
7. Upon referral of Dr. Widmeyer, Dr. Shaffer examined the plaintiff on December 10, 1990, and, after viewing x-rays which he found to be normal, he stated, "I certainly do not find any definite indication for surgical intervention." Again, no mention was made of plaintiff's abilities to work. Dr. Shaffer continued to follow the plaintiff in February and March 1991, recommending only conservative treatment. Although beginning February 11, 1991 Dr. Shaffer kept the plaintiff out of work, as of March 28, 1991, he noted that the plaintiff's complaints were of mostly subjective discomfort with little truly objective evidence of joint disease. Dr. Shaffer recommended a second opinion evaluation at Duke Medical Center.
8. In October 1991, plaintiff was evaluated by another orthopaedist, Dr. Richard H. Fisher. Dr. Fisher's notes reveal plaintiff's complete lack of cooperation, with the physician. He stated, "She will not cooperate in attempting movement of the left toes and foot, even though encouraging her to flex and extend her toes, the normal ones in particular, which have no problems . . . she simply will not cooperate in moving her toes."
9. After a thorough examination as well as a review of the x-rays, Dr. Fisher concluded:
 She continues with symptoms which are stated to be totally disabling and which appear to be out of proportion to reality. . . I feel that she is capable, at present, of pursuing an occupation in a capacity which she was previously employed. This would require motivation. When she was asked about doing toe rising, she simply [ stated] "I can't." (She could in my opinion).
10. On January 9, 1992 plaintiff was seen by Dr. James A. Nunley at Duke University Medical Center. Dr. Nunley reviewed x-rays which showed that the small fracture plaintiff sustained in 1989 was completely healed. Due to her complaints, Dr. Nunley also ordered a bone scan which again was completely normal. Dr. Nunley concluded:
 I think this patient is totally recovered from her compensable injury and has a five (5) percent permanent partial disability of her foot and I believe that she could get on with her life as I don't feel that any surgical treatment would benefit her. Her gait today interestingly shows that during the examination she walks only [on] the lateral border of her foot although she can tiptoe quite well. However, once she is distracted and walks down the hall completely she walks with a totally normal gait which in some ways substantiates my feelings that surgery would not be beneficial.
11. Subsequent to this second opinion evaluation, the plaintiff returned to Roanoke Orthopaedic Center where her treatment was taken over by Dr. Robert A. Pruner in January 1992. Not only did Dr. Pruner examine the plaintiff, but he also reviewed all of her medical records as well as the x-rays and the bone scan. Dr. Pruner found plaintiff to be at maximum medical improvement and to have sustained a five (5) percent permanent partial impairment of her foot with only a mild loss of motion. Dr. Pruner released the plaintiff from his care and noted that she was able to work in a position which did not require walking or standing on an indefinite basis.
12. Near the end of May, 1992, plaintiff began applying for various positions with the assistance of Mr. Ben S. Bowman, a vocational consultant provided by the defendants. Mr. Bowman's records reveal that as of May 26, 1992 the vocational expert had contacted twenty-four (24) employers on behalf of the plaintiff and had located many openings; however, plaintiff did not arrange for any interviews and, furthermore, did not meet with Mr. Bowman as scheduled. At said time the plaintiff was medically capable of earning the same wages she earned before her injury in her former employment or in some other employment.
13. On June 12, 1992, a physical capacities questionnaire was completed by Dr. Pruner in an effort to assist the plaintiff in returning to work. This assessment revealed that the plaintiff was able to frequently stand and walk, to sit continuously and perform various activities such as climbing stairs, squatting, bending and twisting on an occasional basis. Dr. Pruner verified that the plaintiff was able to return to work and, in fact, could return to her former job.
14. Plaintiff's refusal to cooperate with job search efforts by vocational rehabilitation constituted an unjustifiable refusal to accept suitable employment warranting a suspension of compensation as of May 26, 1992.
15. Despite the lack of effort put forth by plaintiff, Mr. Brewer was able to obtain a part-time position for the plaintiff as an activity director with Roanoke County to begin August 26, 1992. The job description was reviewed by Dr. Ripley, who reported that he would approve the job as long as plaintiff did not have to run or stand over one (1) hour. The job duties of the activity director were modified per the Roanoke County director of personnel, and the plaintiff was in fact offered the position; however, plaintiff did not report to work. Due to plaintiff's complete lack of cooperation and refusal to report to an acceptable position, all rehabilitative efforts were thereafter ceased.
16. Plaintiff did not seek any employment on her own until December 1992 when she went back to work for Surry Temporary Agency and thereafter Piedmont Temporaries.
17. Plaintiff has not received any medical treatment since seeing Dr. Pruner in August 1992.
*******************
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. On August 2, 1989, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of employment. Plaintiff was paid temporary total disability benefits from August 4, 1989 through August 3, 1990 and from December 10, 1990 through August 30, 1992.
2. Plaintiff's disability ended on May 26, 1992 when she refused to cooperate with job search efforts by defendant although she had been found medically capable of working and earning wages as of January, 1992. N.C. Gen. Stat. § 97-32.
3. As of January 9, 1992, plaintiff reached maximum medical improvement and retained a 5% permanent partial disability to her foot.
4. Defendant is entitled to a credit offset against the plaintiff's entitlement to 7.2 weeks of permanent partial disability compensation for the overpayment of temporary total disability compensation made to plaintiff from May 26, 1992 through August 30, 1992.
5. Plaintiff is entitled to payment by defendant of all medical expenses arising from her compensable injury.
*****************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Plaintiff is entitled to no further temporary total disability or permanent partial disability benefits as she has already been overpaid. Therefore, her claim for additional temporary total disability and permanent partial disability benefits is hereby DENIED.
2. Defendants shall pay all medical expenses incurred by plaintiff arising from her compensable injury (if not already paid) when bills for same have been submitted and approved through procedures adopted by the Commission.
2. Defendants shall pay the costs, including an expert witness fee in the amount of $275.00 to Dr. Robert S. Widmeyer and $300.00 to Dr. Louis P. Ripley.
 S/ ____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ J. RANDOLPH WARD COMMISSIONER
S/ ______________________ DIANNE C. SELLERS COMMISSIONER
BSB:md